IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| KIM DEVERALL, on behalf of K.D., a minor child,<br><br>    Plaintiff,<br><br>v.<br><br>JORDAN SCHOOL DISTRICT,<br><br>    Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE RECORD AND DENYING AS MOOT DEFENDANT'S MOTION FOR HONIG INJUNCTION**<br><br>Case No. 2:25-cv-00181-JNP-JCB<br><br>Chief District Judge Jill N. Parrish |

Pursuant to Federal Rule of Civil Procedure 56, Defendant Jordan School District requests the court enter judgment on the administrative record, dismissing Plaintiff Kim Deverall's complaint and upholding an Administrative Hearing Officer's December 31, 2024 decision made pursuant to the Individuals with Disabilities Education Act ("IDEA"). *See* ECF No. 46 at 1–2. For the following reasons, the court GRANTS the motion.

## BACKGROUND

**I.    The Individuals with Disabilities Education Act ("IDEA")**

As the Tenth Circuit has recently explained,

Congress passed the IDEA to ensure "children with disabilities receive needed special education services." *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 157 (2017). The IDEA "requires States receiving federal funding to make a 'free appropriate public education' available to all children with disabilities residing in the State." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 232 (2009) (quoting 20 U.S.C. §

1412(a)(1)(A)). A [free appropriate public education][1] is considered a "basic floor of opportunity" to allow a child with disabilities access to an individually designed education. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty v. Rowley*, 458 U.S. 176, 201 (1982). At the "core" of the [free appropriate public education] requirement is the "cooperative process . . . between parents and schools," *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005), to jointly craft an "'individualized education program,' or IEP" for each disabled student, *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017) (quoting 20 U.S.C. § 1401(9)(D)).

An IEP is the "comprehensive plan" by which "special education and related services are 'tailored to the unique needs' of a particular child." *Endrew F.*, 580 U.S. at 391 (quoting *Rowley*, 458 U.S. at 181). Each IEP is "prepared by a child's 'IEP Team[,]' [ ]which includes teachers, school officials, and the child's parents." *Id.* An individualized education program "serves as the 'primary vehicle' for providing each child with the promised [free appropriate public education]." *Fry*, 580 U.S. at 158 (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)).

*Alex W. v. Poudre Sch. Dist. R-1*, 94 F.4th 1176, 1180 (10th Cir. 2024).

"[T]he IDEA further obligates states 'to educate disabled children in the 'least restrictive environment' in which they can receive an appropriate education.'" *Jacobs v. Salt Lake City Sch. Dist.*, 154 F.4th 790, 802 (10th Cir. 2025) (quoting *Murray By & Through Murray v. Montrose Cnty. Sch. Dist. RE-1J*, 51 F.3d 921, 926 (10th Cir. 1995)). Regarding that placement process:

"Placement decisions must be based on the child's IEP" and must be individualized for each child. [*Ellenberg v. New Mexico Mil. Inst.*, 478 F.3d 1262, 1268 (10th Cir. 2007)]. By regulation, "each public agency," "[i]n determining the educational placement of a child with a disability, . . . must ensure that . . . (b) The child's placement—(1) Is determined at least annually; (2) Is based on the child's IEP; and (3) Is as close as possible to the child's home." 34 C.F.R. § 300.116(b). The public agency must further ensure that, "[u]nless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled." *Id.* § 300.116(c).

---

[1] Often referred to as a "FAPE."

*Jacobs*, 154 F.4th at 802. "If the [individualized education program, or IEP,] requires placement elsewhere, then, in deciding where the appropriate placement is, geographical proximity to home is relevant, and the child should be placed as close to home as possible." *Id.* (quoting *Murray*, 51 F.3d at 929).

## II.    Student K.D.[2]

Student K.D., a minor child, has complex medical needs and developmental disabilities. He "has global delays, is considered non-speaking, and was recently diagnosed with White-Sutton Syndrome." AR 429 ¶ 2. He sometimes has behavior issues and often struggles with sleep, anxiety, new environments, and transitions from one location to another. *Id.* ¶ 3. According to one medical expert involved in supporting K.D., Dr. Aaron Fischer, K.D.'s need for support put him in the top 1% of students he has supported in his career. AR 451 ¶ 123; *see* AR 1014 (another professional, Krystin Wingert, stated that "K.D. is a more severe individual. He requires a considerable amount of support in helping him to be successful."). Plaintiff is K.D.'s mother.

K.D. attended South Hills Middle School in the Jordan School District for his seventh- and eighth-grade years. AR 428 ¶ 1. During those years, he was supported by a variety of staff and professionals. Before detailing the events relevant to the current motion, it is worth explaining the roles of the different professionals with whom Plaintiff and K.D. interacted.

First, a Board Certified Behavior Analyst[3] is a professional who has a master's degree in psychology or education, who has 2,000 hours of fieldwork experience, and who has passed a

---

[2] The court draws these factual findings from the Administrative Record submitted to the court by the parties. *See* ECF Nos. 18–28.

[3] Often referred to as a "BCBA."

board exam. AR 430 ¶ 11. Next, a Registered Behavior Technician[4] is a professional who has a high school diploma, who has 40 hours of training, who has passed a competency exam, and who is assessed and partially supervised by a Board Certified Behavior Analyst. *Id.* ¶¶ 11–14. The role of a Registered Behavior Technician is often to implement the programming created by a Board Certified Behavior Analyst. AR 1012–13. Finally, a paraprofessional provides general assistance in special education classrooms, including behavioral and academic support. *See* AR 1013. Depending on level of training, a paraprofessional in a school setting is able to deliver the same support as a Registered Behavior Technician. AR 430 ¶ 15; *see* AR 1013. The paraprofessionals at K.D.'s school, South Hills, were highly trained. AR 454–55 ¶¶ 136–38.

K.D.'s seventh-grade year was the 2022–2023 school year. AR 428 ¶ 1. K.D. was placed in the "functional academics" classroom, for students with lower cognitive levels. *Id.* ¶¶ 5–6. K.D.'s individualized education program, or IEP, for this year, dated February 3, 2022, had 15 goals and provided for 700 minutes of weekly behavioral support. *Id.* ¶ 7; AR 1490–1504 (IEP dated February 3, 2022); AR 3728–3745 (same); AR 3747 (IEP amendment dated March 3, 2022). K.D. also had a behavior intervention plan, or BIP, dated January 20, 2022. *Id.* ¶ 8; AR 3720–3727 (BIP dated Jan 20, 2022).

BCBA Kristyn Wingert was on K.D.'s IEP team that year, and she worked extensively with K.D.'s teacher and other team members who helped to support K.D. AR 429–30 ¶¶ 9–10. She reviewed his behavior intervention plan that year, finding the number of targets "pretty overwhelming" and "very intensive." AR 431 ¶ 23. As part of her role as cluster leader of multiple classrooms, BCBA Wingert conducted a training at the beginning of K.D.'s seventh grade year

---

[4] Often referred to as an "RBT."

with all of the paraprofessionals working in K.D.'s classroom to ensure "that everybody was on the same page with" K.D. AR 430 ¶ 17; AR 961.

K.D.'s mother, Plaintiff, communicated with the South Hills staff throughout K.D.'s seventh-grade year. AR 433 ¶¶ 35, 36, 38. She often did so through the "Remind App." *Id.* ¶ 35. Plaintiff would also receive daily home notes, which were developed by BCBA Wingert in coordination with Plaintiff. AR 432 ¶ 25; AR 433 ¶ 34; AR 962. These home notes included notes on K.D.'s progress on target behaviors, as well as information on what he ate during the day and on his toileting behavior. AR 432 ¶ 25.

K.D.'s toileting habits, specifically, took on increasing importance in his seventh-grade year. Prior to the start of the year, he began regressing with toileting, requiring him to wear a pull-up or brief. AR 431 ¶ 22. He faced continued regression in his toileting during the year, including withholding his bowel movements. AR 437 ¶ 56.

During the winter of that school year, South Hills Middle School attempted to integrate K.D. into general education art classes and special education math classes, accompanied by a trained paraprofessional.[5] AR 432 ¶¶ 26-27; AR 971; AR 1018. The teachers of those classes received training relating to K.D.'s behavior intervention plan prior to his attendance. AR 971. The other students in the class were also prepared, being told to say hello to K.D. and to give him high-fives. AR 432 ¶ 28. K.D.'s time in these classes was often short, with him spending only 10–15 minutes in his special education math class, for example. AR 432 ¶ 30. He would not often engage

---

[5] An email in the record dated January 3, 2024, from Susan Call, the math teacher at the time, suggests that as of that date, K.D. had still not actually spent time in a general education setting because of his difficulties in transitioning to that setting. AR 1566. However, it appears that K.D. was later able to attend his general education art class. *See* AR 1018.

independently with other students and would at times disrupt the learning environment. AR 432–33 ¶¶ 31–32; AR 1101 (noting that one day K.D. "got escalated and ran around the room and threw a few calculators off desks"). De-escalation could require a significant number of staff members. AR 435–36 ¶ 49.

K.D.'s IEP continued to be evaluated through the Spring of 2023. AR 436 ¶¶ 51–53; *see* AR 1509–1524 (IEP dated February 8, 2023); AR 2082–2098 (IEP signed April 21, 2023). This was an iterative process, with both the IEP team and Plaintiff reviewing each other's input and feedback. AR 990–991; AR 436 ¶ 52; *see* AR 2021–2070 (input into the IEP). For example, there were meetings between Plaintiff and the IEP team on January 30, 2023, February 8, 2023, April 21, 2023, and May 26, 2023. AR 2019–2020 (January 30, 2023 meeting notice); AR 2071–2073 (January 30, 2023 meeting notes); AR 436 ¶ 51 (February 8, 2023 meeting); *Id.* ¶ 53 (April 21, 2023 meeting); AR 437 ¶ 54 (May 26, 2023 meeting); AR 2136–2137 (May 26, 2023 meeting notice). A significant focus of these discussions was K.D.'s toileting plan.[6] *See* AR 994-95. The IEP team also added in an explicit annual training section "to ease some of [Plaintiff's] concerns." AR 997; *see* AR 2109–2121 (April 2023 BIP).

BCBA Wingert left South Hills Middle School toward the end of K.D.'s seventh-grade year. AR 1003. In the summer between his seventh- and eighth-grade years, K.D. participated in extended school year services at South Hills. AR 438 ¶ 60. During this extended school year, K.D. was the only student present and appeared to participate successfully. *Id.* 438 ¶¶ 60–61; AR 1254.

---

[6] BCBA Krystin Wingert testified in the due process hearing that the "toileting plan . . . was kind of the biggest change . . . that we made to the" April 2023 IEP. AR 995. She stated that the IEP team "more formalized" the toileting plan and "added it as part of the behavior intervention plan." *Id.* However, it does not appear that the actual behavior intervention plan in the April 2023 IEP contained a formal toileting plan. *See* AR 2109–2121 (April 2023 BIP).

K.D.'s eighth grade year (from 2023–2024) brought more challenges, however. K.D. was again placed in the functional academic classroom. *See* AR 455 ¶ 139. Because BCBA Wingert no longer worked at South Hills, the responsibility for K.D.'s programming fell primarily to Susan Call, the new cluster class lead, and Kristan Thompson, K.D.'s special education teacher. AR 1216, 1252–53.

At the beginning of the year, Call reached out to Plaintiff to discuss staff training on K.D.'s behavior intervention plan and a communication plan with Plaintiff. AR 439 ¶ 64. The communication plan again included daily home notes, and staff had regular communication with Plaintiff. *Id.*; AR 1108–1111. There were also monthly meetings, which included Thompson, Call, Plaintiff, and others. AR 1111. With respect to staff training, the paraprofessionals received quarterly training on K.D.'s behavior intervention plan. AR 1107. At times, the IEP team would also seek the assistance of the district-wide Jordan Behavioral Assistance Team,[7] which would check in at times and review the behavior intervention plan with the IEP team to ensure proper understanding. AR 439 ¶ 66; AR 1218–19.

Despite this preparation, K.D. had continued difficulties. For example, K.D. had difficulty transitioning to the bathroom, leading to aggression and disruptive behavior. AR 440 ¶ 70. South Hills eventually switched K.D.'s classroom assignment to attempt to address this issue, but Plaintiff further raised concerns about K.D.'s access to the bathroom, requesting hourly bathroom visits. *Id.* ¶ 71.

On December 6, 2023, South Hills Middle School staff and District employees held a "pre-IEP" meeting to discuss K.D. AR 441 ¶ 74. At that meeting, the school staff informed the District

---

[7] Often referred to as "JBAT."

employees that they needed more staff to help with K.D., but no one at the meeting discussed placement for K.D. *Id.*

The next day, on December 7, an IEP meeting was held with Plaintiff in attendance. *Id.*; AR 2192 (December 7, 2023 meeting notice). At the meeting, Plaintiff had a chance to discuss her concerns, which included behavior, staffing, and training. AR 441 ¶ 75; AR 2194 (December 7, 2023 meeting notes). She also stated that if there were behavior issues with K.D., the IEP team needed to re-evaluate the behavior intervention plan. AR 441 ¶ 75. The District suggested bringing in an outside Board Certified Behavior Analyst. *Id.* ¶ 76; AR 1299. The District thought the outside Board Certified Behavior Analyst would be useful in helping Plaintiff trust the team and in helping to manage K.D.'s behaviors, which they described as becoming "very intense and extreme" once Plaintiff requested hourly toileting. AR 442 ¶¶ 77–78; AR 1299. Plaintiff agreed to bring in BCBA Dr. Radley.[8] AR 441 ¶ 76.

In January 2024, the IEP team and Plaintiff continued to meet. Meetings were held on January 12, January 22, and January 31. AR 446–47 ¶¶ 95, 96, 98; AR 2207 (January 12, 2024 meeting notice); AR 2209 (January 12, 2024 meeting notes); AR 2256 (January 22, 2024 meeting notes); AR 2260 (January 31, 2024 meeting notice); AR 2265 (January 31, 2024 meeting notes). Throughout these meetings, Plaintiff raised various issues for discussion. *See, e.g.*, AR 446 ¶ 97.

The January 31 meeting was in part focused on educational placement for K.D., in addition to finalizing the behavior intervention plan. AR 447 ¶ 98. Driving that placement discussion was the fact that K.D. "was not making meaningful progress in the setting, despite all the supplements

---

[8] Plaintiff emphasizes that she initially requested that the school consult with BCBA Dr. Fischer, Plaintiff's expert and private Board Certified Behavior Analyst. AR 598.

and aide support." AR 448 ¶ 104; *see* AR 1238 (noting K.D. "was not making adequate or meaningful progress on his goals"). The IEP team proposed a change of placement to Kauri Sue Hamilton School. AR 2267. Kauri Sue Hamilton, a "severe and profound" school, provides more intensive behavioral supports to all its students. AR 447–48 ¶¶ 99, 103. The IEP team believed that South Hills presented a more restrictive environment than Kauri Sue Hamilton largely because of the location of the bathroom in South Hills, in connection with K.D.'s toileting needs and difficulties in transitioning. *See* AR 447–48 ¶¶ 100–101. As part of this recommendation, the District prepared a Change of Placement form dated January 31, 2024. *See* AR 2283 (Change of Placement form). The form noted that K.D.:

> is in the most restrictive environment currently in a special class. [K.D.] requires intensive supports and is not making progress on current goals. . . . Degree of curricular instruction and behavior supports needed are not sufficient in the current placement of special class and require special school supports. . . . [K.D.] requires intensive academic and behavioral supports and modification.

*Id.* Plaintiff did not agree with the proposed change of placement and requested that any placement at Kauri Sue Hamilton be delayed to see if changes to the behavior intervention plan would help. AR 449 ¶¶ 107, 109. The IEP team agreed to do so. *Id.* ¶ 110. They decided to further implement the behavior intervention plan being developed by BCBA Dr. Radley, take data, and reconvene. AR 452 ¶ 126.

K.D.'s new IEP, developed with the help of BCBA Dr. Radley, was finalized in February 2024. AR 442 ¶ 84; AR 2212 (IEP Annual Review dated January 12, 2024); AR 1569–92 (IEP Annual Review dated January 31, 2024); AR 2290 (IEP Amendment dated February 6, 2024); *see* AR 2305 (Review of February 14, 2024 BIP). On February 9, 2024, the District issued a Prior Written Notice of Refusal to Take Action letter to Plaintiff, addressing four requests Plaintiff had

raised in prior recent meetings. AR 453 ¶ 133; AR 2297. The requests centered around (1) Plaintiff's concerns about K.D.'s academic math goal, (2) the termination of direct occupational therapy services, (3) Plaintiff's request for additional speech minutes, and (4) Plaintiff's request for a Registered Behavior Technician. *See* AR 2297.

With respect to the termination of direct occupational therapy services, the IEP team determined that the data through January 31, 2024 showed that K.D. had developed a level of independence in the relevant areas, allowing a shift to a consultative model. AR 1082–83. After the removal of direct occupational therapy services, Plaintiff requested an individualized educational evaluation. AR 3278–3284. The evaluation was completed in April 2024 in a medical setting. AR 1085–86, 1088.

With respect to the request for a Registered Behavior Technician, the District notice letter stated as follows:

> The Parent stated the current instructional assistants are not trained enough to work with [K.D.] The Parent requested a Registered Behavior Technician be placed with [K.D.]. The school members of the IEP team explained that classroom instructional assistants receive 40 hours of training. This training includes: the role of the paraeducator, building relationships, specially designed instruction, accommodations and modifications, engaging strategies, transition, social emotional learning, data collection, a variety of behavior training, and other practices. The behavior training includes behavior management, positive behavior practices, and de-escalation with specific behaviors. This course is modeled after the Utah state board of education's [paraeducator] manual with the addition of the above listed strategies as part of our advanced training. The school team feels that maintaining full-time aide support for [K.D.] is appropriate. [K.D.] currently has at least two trained adult aides, teachers, or related service providers with him throughout the day.

AR 2299. In fact, during K.D.'s seventh-grade year, all staff who worked with K.D. were trained on his needs, and in his eighth-grade year, all of the paraprofessionals received such training as well. *See* AR 430 ¶ 17; AR 455 ¶ 139.

Over the following eight to nine weeks, the IEP team continued to implement the new behavior intervention plan developed by BCBA Dr. Radley, meeting monthly with Dr. Radley, Call, Plaintiff, and two outside Board Certified Behavior Analysts. AR 452 ¶ 131. In March, the IEP team met to review the data and the behavior intervention plan. AR 631–32; AR 455 ¶ 140; AR 2315 (BIP review notes); AR 2327 (BIP review dated March 19, 2024). Deciding to consider more data, the team scheduled another review meeting for April 29.[9] *See* AR 1813. During this time, K.D. saw some progress, but the school's staff also had to significantly reduce academic and other demands. AR 450 ¶ 114; AR 456 ¶¶ 144, 146–147. And, K.D. still at times had behavioral incidents. *See, e.g.*, AR 1267–1268; AR 456 ¶ 149.

On May 28, 2024, the IEP team met again. AR 455 ¶ 142; AR 2375 (May 28, 2024 meeting notes). They again proposed a change of placement to Kauri Sue Hamilton. Driving this recommendation were concerns around academic progress, transition progress, and accessing classroom peers. AR 457 ¶ 152. In addition, the IEP team believed that South Hills was too restrictive for K.D.'s needs, that K.D. was not safe enough to teach in the academic cluster or mainstream classes, and that K.D.'s dignity would be better protected at Kauri Sue Hamilton. *See* AR 447 ¶ 100; AR 451 ¶ 119; AR 453 ¶ 132. The IEP team considered various features of Kauri Sue Hamilton that they thought would be beneficial for K.D., including its size, number of

---

[9] It appears that Plaintiff received an email on April 18 requesting that she select a time for a "placement meeting." AR 1813–1815. Nevertheless, the April 29 data review meeting occurred as scheduled. AR 1685; AR 2346 (BIP review notes); AR 2350 (BIP review dated April 29, 2024).

students, number of exits, facilities, and services. *See* AR 450–451 ¶¶ 114–121; AR 456–457 ¶¶ 150–152. The District offered Plaintiff both a visit to Kauri Sue Hamilton and the option to hold K.D.'s extended school year at Kauri Sue Hamilton for the upcoming summer. AR 457 ¶ 154. Plaintiff did not accept the extended school year offer. *Id.*

Plaintiff objected to the transfer to Kauri Sue Hamilton because she found the staff at Kauri Sue Hamilton less amendable to collaboration and transparency and because K.D. would not have "access to peer models." AR 457 ¶ 153. Ultimately, the IEP team voted to change K.D.'s placement. AR 655. On June 10, the District issued another Prior Written Notice of Refusal to Take Action letter with regard to the change in placement. AR 1698–1702; AR 2387. The letter detailed the data reviewed by the IEP team in making the decision. AR 1698–1702; AR 2387.

## III.   Administrative Hearing

Plaintiff filed a Request for a Due Process Hearing on August 14, 2024, alleging that the District denied K.D. a free appropriate public education. AR 423. As part of this administrative process under the IDEA, a due process hearing was held from November 13–15, 2024. *Id.* The Hearing Officer ultimately considered the testimony of thirteen witnesses she considered credible and admitted over eighty exhibits. *Id.* at 424–428. Ultimately, the Hearing Officer issued a memorandum decision and order that included findings of fact and conclusions of law.

The Hearing Officer found that Plaintiff's arguments regarding both procedural and substantive violations of IDEA were unpersuasive and unsupported by the record. AR 457. She found that the evidence clearly established that the District developed, and repeatedly reviewed and revised, K.D.'s individualized education program and behavior intervention plan consistent with K.D.'s unique needs. AR 459. In reaching this conclusion, the Hearing Officer noted that Plaintiff failed to meet her burden of proof in showing that K.D. needed a Registered Behavior

Technician to receive a free appropriate public education. AR 460. She also found that Plaintiff did not prove that K.D.'s IEP needed to identify the methodology of applied behavior analysis therapy in order for K.D. to have received a free appropriate public education or that the District had in place a de facto policy of refusing applied behavior analysis therapy principles. AR 463. The Hearing Officer also found that the record demonstrated that South Hills was more restrictive for K.D. than Kauri Sue Hamilton would be. AR 464. In addition, she found that Plaintiff "attended and meaningfully participated constantly in [K.D.'s] educational plan." AR 467. The record, according to the Hearing Officer, did not support the claim that the District unilaterally pre-determined placement. AR 468.

After the Hearing Officer's decision, Plaintiff filed this civil action. *See* ECF No. 1-1.

## LEGAL STANDARD

In an IDEA civil action, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(c).

"[M]any IDEA claims do not fit into the typical summary judgment standard of 'no genuine issues of material fact.'" *Ellenberg v. New Mexico Mil. Inst.*, 478 F.3d 1262, 1274 (10th Cir. 2007) (quoting *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 973–74 (10th Cir. 2004)). Rather, "[t]he IDEA sets up a unique standard for a federal court's review of [an] administrative due process hearing. A district court applies a modified *de novo* standard in reviewing a hearing officer's decision under the IDEA. It looks at the record of the administrative proceedings and decides, based on a preponderance of the evidence, whether the requirements of the IDEA [were] met. In so doing, it must give 'due weight' to the hearing officer's findings of fact, which are considered

*prima facie* correct. Although the district court may accept additional evidence, such evidence is merely supplemental to the administrative record." *Ellenberg*, 478 F.3d at 1274 (quoting *L.B.*, 379 F.3d at 973–74).

## ANALYSIS

In her complaint, Plaintiff argues that the Hearing Officer's decision was not supported by the evidence and is deficient for a variety of reasons. ECF No. 1-1 ¶ 99. In response, the District requests that the court enter judgment on the administrative record, dismissing Plaintiff's complaint and upholding the Hearing Officer's decision finding that the District provided K.D. with a free appropriate public education. ECF No. 46 at 2.

As a preliminary matter, Plaintiff finds fault with the procedural posture of Defendant's motion. As Plaintiff notes, the "disposition" of this case is a motion for "a judgment on the administrative agency's record." *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004). In other words, it is effectively a "bench trial on the administrative record" that "must maintain the character of review and not rise to the level of a *de novo* trial." *Id.* But Plaintiff asserts that judgment on the record is premature because only Defendant has so far filed a motion for judgment. Thus, the court is not considering cross motions for summary judgment. ECF No. 52 at 28. Plaintiff asserts there is consequently "no complete stipulated record for the court to review." *Id.*

The court concludes that the current procedural posture presents no obstacle to resolving the motion. When undertaking an IDEA administrative record review, a court must "independently review the evidence contained in the administrative record, accept and review additional evidence, if necessary, and make a decision based on the preponderance of the evidence, while giving due weight to the administrative proceedings below." *Murray v. Montrose Cty. Sch. Dist. RE-1J*, 51

F.3d 921, 927 (10th Cir. 1995) (internal quotation marks omitted). If a party seeks to present additional evidence, the court "shall hear" and "may accept" the additional evidence. 20 U.S.C. § 1415(i)(2)(c) (as to the former quotation); *Ellenberg v. New Mexico Mil. Inst.*, 478 F.3d 1262, 1274 (10th Cir. 2007) (as to the latter).

Here, the parties have stipulated that the administrative record submitted to the court reflects the entirety of the existing administrative record. ECF No. 52 at 28 n.3. While Plaintiff has provided to the court various additional pieces of evidence she wishes the court to consider, she has not identified the existence of any other potential evidence.[10] The court is thus well-positioned to review the additional evidence she has identified and determine if it is properly considered. *See Wiesenberg v. Bd. of Educ. of Salt Lake City Sch. Dist.*, 181 F. Supp. 2d 1307, 1316 (D. Utah 2002) ("If this additional evidence is supplemental in nature, the court must hear it before concluding its review."); *O'Toole By & Through O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 708 (10th Cir. 1998) ("We have held that the district court has discretion to determine if

---

[10] Plaintiff does contend in a footnote and in oral argument that testimony elicited during a bench trial should also be received as additional evidence, so long as that testimony is supplementary. ECF No. 52 at 30 n.5. But Plaintiff makes no effort to identify what that testimonial evidence might be or whom it might come from, so the court finds it no bar to judgment on the record. *See O'Toole By & Through O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692 (10th Cir. 1998) (affirming a district court which excluded additional evidence that was not identified during the discovery period); *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004) (noting that a district court's review should not rise to the level of a *de novo* trial).

Plaintiff also argues that evidence relating to Defendant's later-filed motion for a *Honig* injunction should be considered as supplemental evidence. While it is true that evidence of *relevant* events occurring subsequent to the administrative hearing can properly supplement the record, the events at issue in the *Honig* injunction motion, which arise out of recent events at Herriman High School, are not relevant to Plaintiff's claims here, which stem from K.D.'s time at South Hills Middle School.

such additional evidence is necessary."). The motion for judgment on the record is accordingly ripe for decision.

Finally, while the resolution of IDEA claims has been described as a bench trial on the record, resolution does not require an actual bench trial, as Plaintiff seems to contend.[11] ECF No. 52 at 34. Where the court has all potential evidence before it, and where disputes of fact pose no bar to judgment in the IDEA context, the court does not find a bench trial necessary or helpful to the resolution of the matter. *L.B.*, 379 F.3d at 974 (noting that a district court's review should not rise to the level of a *de novo* trial); *Murray By & Through Murray v. Montrose Cnty. Sch. Dist. RE-1J*, 51 F.3d 921, 928 n.12 (10th Cir. 1995) ("While our research reveals that summary judgment is not frequently granted in IDEA cases, there is no prohibition against it."); *Gallup McKinley Cnty. Schs. Bd. of Educ. v. Garcia*, No. 16-01336-JTM-LF, 2019 WL 7596273, at *1 (D.N.M. Sept. 24, 2019) (noting that the Tenth Circuit has "indicated some support for a summary resolution of IDEA appeals in appropriate circumstances"); *L.B.*, 379 F.3d at 974 (the Tenth Circuit citing to *Beth B. v. Van Clay*, 282 F.3d 493, 496 n. 2 (7th Cir. 2002), in which the Seventh Circuit described summary judgment in IDEA cases as judgments on the record "appropriate even when facts are in dispute").

The court therefore considers whether it is appropriate in this case to supplement the administrative record with Plaintiff's additional evidence. It then considers, based on a preponderance of the evidence, whether the requirements of the IDEA have been met by the District.

---

[11] Plaintiff clarified in oral argument that the bench trial she seeks would more accurately be described as an evidentiary hearing in which the court receives supplemental evidence and hears testimony relating to that supplemental evidence.

I.       **The Administrative Record and Additional Evidence**

The parties have provided this court with the administrative record, which the court has reviewed. *See* ECF Nos. 18–28. Part of this record includes the Hearing Officer's memorandum decision and order, which includes her finding of facts. As a threshold matter, the court holds that the Hearing Officer's factual findings are owed due deference—they are considered *prima facie* correct. *See Sytsema ex rel. Sytsema v. Acad. Sch. Dist. No. 20*, 538 F.3d 1306, 1311 (10th Cir. 2008) ("During its review of the administrative record, the district court must 'give 'due weight' to the hearing officer's findings of fact, which are considered *prima facie* correct.'"). After reviewing the underlying record, the court finds that the Hearing Officer oversaw a careful, detailed administrative process and that her factual findings are likewise detailed and supported by the record.[12]

The court now considers whether Plaintiff may present her additional evidence for the court's consideration. As stated, if a party seeks to present additional evidence, the court "shall hear" and "may accept" the additional evidence. 20 U.S.C. § 1415(i)(2)(c) (as to the former quotation); *Ellenberg*, 478 F.3d at 1274 (as to the latter). Nevertheless, a party's *request* to the court to hear additional evidence is bound by the strictures of procedural rules and the principles of orderly docket management just as is any other motion or request. *See O'Toole By & Through O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 708–09 (10th Cir. 1998).

---

[12] Plaintiff's argument that the court should award minimal deference to the Hearing Officer's findings of fact rests largely on the assertion that the Hearing Officer should have included in her opinion additional facts from the record. ECF No. 52 at 35. It is always easy, however, to contend that insufficient detail was included in a written decision, and the additional facts Plaintiff identifies do not convince the court that the Hearing Officer erred by choosing to not include them.

For example, in *O'Toole*, the Tenth Circuit considered whether a district court abused its discretion when barring a party from presenting additional evidence related to an IDEA claim. *See O'Toole*, 144 F.3d at 708–09. In that case, the district court had denied O'Toole's motion for an extension of time to file a formal written request to present additional evidence. *Id.* The district court explained that O'Toole did not timely identify and produce the evidence during the discovery period, which closed over three months before O'Toole sought to include it for review. *Id.* The Tenth Circuit affirmed the district court, finding no abuse of discretion. *Id.*

Defendant raises two procedural points here. First, Defendant argues that before presenting additional evidence, a party must actually make a motion that is granted by the court. ECF No. 46 at 5. Defendant notes that Plaintiff has not made such a motion, thereby limiting the facts to those found within the existing administrative record. *Id.* This argument relies, in part, on this court's local rules, which state that a party may not make a motion within a response brief. DUCivR 7-1(a)(3). Defendant next argues that even if there were such a motion, it is untimely. ECF No. 62 at 4. It notes that fact discovery closed on August 1, 2025, almost six months before Plaintiff filed her response brief. *See* ECF Nos. 17 (scheduling order), 52 (Plaintiff's response brief).

Plaintiff responds that she had, in fact, timely requested the court hear additional evidence. Plaintiff points to her complaint, in which she stated that she "respectfully requests that this court review the full administrative record, and that she be able to present additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)." ECF No. 1-1 ¶ 100. Plaintiff also suggests that the fact that each piece of the additional evidence she seeks to present was "well known" to the District militates against its exclusion.

The court need not determine if an actual motion is required in this context because the court finds Plaintiff's request, irrespective of its form, to be untimely. While Plaintiff did signal in

her complaint that she desired to present additional evidence, at no point did she attempt to introduce that evidence to the court until almost six months after the close of discovery.[13] Any argument that she believed introducing the evidence was better suited for the motion *in limine* stage assumes that the case would reach trial, which is not a presumption Plaintiff could validly make.[14] Just as the district court in *O'Toole* found that O'Toole did not timely identify and produce the evidence during discovery, so too does the court find that here.

In addition, the fact that this potential evidence may have been known to the District does not cure the untimeliness of Plaintiff's request. Plaintiff's analogy to the circumstances in *L.S. v. Calhan School District RJ-1* in support of her position is ill-fitting. No. 15-CV-00426-LTB-MJW, 2016 WL 541005, at *3 (D. Colo. Feb. 11, 2016). In *L.S.*, the court found that a party's request to admit additional evidence on the last day of discovery was not untimely or prejudicial. *Id.* In so finding, the court noted that the party seeking admission had repeatedly flagged the evidence in previous filings and that the opposing party had received all the relevant evidence at the time the evidence was created. *Id.* But these circumstances do not mirror those of the instant case in an important way: timing. Plaintiff here attempts to introduce the evidence almost six months after the close of discovery—not within the discovery window like the party in *L.S.*

---

[13] At oral argument, Plaintiff also points to the attorney planning meeting report, submitted on April 24, 2025. ECF No. 11-1. In that report, Plaintiff notes that some "some limited discovery is necessary and appropriate in the present case to fill in gaps in the administrative record, present evidence that was wrongfully excluded, and present additional evidence that was not available at the time of the hearing." *Id.* at 3. But the discovery period came and went without Plaintiff identifying and producing the specific evidence.

[14] Plaintiff's suggestion that the introduction of additional evidence is best suited for motions *in limine* before a trial would render many other pre-trial deadlines in the scheduling order inutile.

The court thus declines to accept the evidence that Plaintiff has raised. But even if the request were timely, the court is not convinced that the additional evidence is properly supplemental, and Plaintiff provides little to no justification for the evidence's inclusion.[15] *See L.B.*, 379 F.3d at 974 (citing to *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472–73 (9th Cir. 1993), which agreed with the First Circuit's articulation of what evidence is properly "additional" or "supplemental" in *Town of Burlington v. Dep't of Educ. for Com. of Mass.*, 736 F.2d 773, 790–91 (1st Cir. 1984)); *Konkel v. Elmbrook Sch. Dist.*, 348 F. Supp. 2d 1018, 1022 (E.D. Wis. 2004) (holding "a court should receive additional evidence at the judicial review stage of an IDEA proceeding only if the movant provides a particularized and compelling justification for doing so"). And, in any event, the court does not find that the evidence would change the court's view of whether the District met the requirements of the IDEA. *See* ECF No. 52 at 23–27.

## II.     The Requirements of the IDEA

The court now turns to whether the District satisfied its IDEA requirements in this case. Like most IDEA claims, Plaintiff's claim revolves around the development, substance, and implementation of K.D.'s individualized education program, or IEP. "The IEP is 'the centerpiece of the statute's education delivery system for disabled children.'" *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). The IEP drafting process "emphasize[s] collaboration among parents and educators

---

[15] The alleged supplementary evidence here "consists of exhibits improperly excluded by the hearing officer, depositions of school district employees conducted during discovery, and documents obtained during discovery." ECF No. 52 at 30. More specifically, the evidence consists of: (1) five excluded audio recordings; (2) depositions of two District employees, Stephanie Johnson and Jason Koelliker; (3) various documents (a "UEA Email Chain," "JBAT Referral Forms," "JBAT Calendar Notices," and an updated Expert Report); and (4) Defendant's Initial Disclosures and Responses to Plaintiff's First Set of Interrogatories. ECF No. 53 at 2.

and require[s] careful consideration of the child's individual circumstances." *Endrew F.*, 580 U.S. at 391. The court looks both to "whether the IEP development process complied with the Act's procedures," and to whether "the IEP's substance provided the student with a" free appropriate public education. *Sytsema*, 538 F.3d at 1312. If there was a procedural violation, the court looks to whether the violation resulted in a denial of a free appropriate public education. *Id.* at 1313. With regard to substance, an IEP provides a student with a free appropriate public education when it is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 580 U.S. at 399.

Plaintiff argues that the District denied K.D. a free appropriate public education. More specifically, Plaintiff puts forward numerous arguments in her complaint, which the court groups into three categories: arguments relating to the January 31, 2024 IEP, an argument relating to the implementation of the April 2023 behavior intervention plan in the Fall of 2023, and a placement predetermination argument.[16]

### A.      The January 31, 2024 Individualized Education Program

Plaintiff first argues that the January 31, 2024 IEP was not tailored to K.D.'s needs. *See* ECF No. 52 at 42. As far as the court can ascertain based on Plaintiff's complaint and briefing, Plaintiff raises three specific issues with respect to the January 31 IEP.

Plaintiff asserts that (1) although districts are required to provide the services that are necessary to help a child succeed on their IEP and behavior intervention plan, the District has a

---

[16] Plaintiff also argues in the complaint that the Hearing Officer failed to include relevant facts that supported a finding that the District denied K.D. a free appropriate public education. ECF No. 1-1 ¶ 99. The court has already found above that the Hearing Officer did not err by failing to include the additional facts in her decision.

blanket policy of not provisioning within an IEP a Board Certified Behavior Analyst or Registered Behavior Technician to help with the implementation of the IEP irrespective of their necessity. *Id.* at 37.

Plaintiff further contends that the involvement of a Board Certified Behavior Analyst and/or Registered Behavior Technician, in line with applied behavior analysis principles, was necessary for K.D.'s progress, as allegedly proven by his prior history. *Id.* at 37. She thus alleges that (2) the failure to include a Board Certified Behavior Analyst or Registered Behavior Technician within the January 31 IEP and behavior intervention plan constitutes a violation of the IDEA. *Id.* at 41; *id.* at 42 (Plaintiff arguing that "at the time the January 31[st] IEP was developed, the school team had no basis to believe that their staff alone could implement K.D.'s [behavior intervention plan] without significant support from a [Board Certified Behavior Analyst]").

In connection with these arguments, Plaintiff also asserts that (3) the District's alleged policy of refusing to consider a Board Certified Behavior Analyst and/or Registered Behavior Technician also denied K.D.'s parents their ability to meaningfully participate in the IEP process. *Id.* at 46.

With these three issues delineated, the court turns to the first: whether the substance of the IEP suffered from some sort of de facto, blanket District policy against utilizing or including in the IEP certain applied behavior analysis-informed resources like Board Certified Behavior Analysts or Registered Behavior Technicians. The record shows that the District did not adhere to this alleged prohibition; rather, the District simply believed its staff, including its paraprofessionals who had received additional training and support, was sufficiently qualified to implement K.D.'s IEP and behavior intervention plan. *See* AR 454–55.

Plaintiff disagrees, contending that the record shows that the District believed that no child will ever require the provision of a Board Certified Behavior Analyst or Registered Behavior Technician in their IEP. ECF No. 52 at 37. But the record does not support this contention. Plaintiff points to the transcript of the Due Process Hearing, in which Kim Lloyd, the District Director of Special Education, was cross-examined by Plaintiff. AR 1388. In response to the question, "[I]s there ever a time in your opinion where a [Board Certified Behavior Analyst] would be required to provide appropriate services for a particular kid?", Lloyd responds, "[N]o, I don't think it's required." AR 1394. After clarifying the question, however, Lloyd answers, "So the futuristic side of that question, I can't answer because you never know. From my current knowledge of our students, the answer would be no." AR 1396. Lloyd's soon-after clarification precludes a finding that the District had a policy of refusing such services as a general matter. Instead, Lloyd, who would appear to be able to speak to District policy to some degree, believed that the provision of a Board Certified Behavior Analyst in an IEP was just not needed for the current roster of students. Supporting this testimony is the fact that it was the District that suggested bringing in an outside Board Certified Behavior Analyst for K.D. when it thought it appropriate, a far cry from allegedly adhering to some policy against utilizing Board Certified Behavior Analysts. AR 441 ¶ 76; AR 1299. In short, Plaintiff has not met her burden in showing there was any sort of de facto policy affecting the substance or development of K.D.'s IEP.

Though Plaintiff has not shown the existence of a de facto policy, the question remains whether the District's decision to not explicitly include a Board Certified Behavior Analyst or Registered Behavior Technician in K.D.'s IEP was reasonable—the second issue Plaintiff raises. The court finds that it was.

The court considers the adequacy of an IEP "from the perspective of the time it is written." *O'Toole*, 144 F.3d at 702. The court also limits its analysis to whether the inclusion of either of these two types of professionals to support the IEP's implementation was necessary for the IEP to be reasonably calculated to enable K.D. to make progress appropriate in light of his circumstances. *See Endrew F.*, 580 U.S. at 399. Plaintiff raises no other issue, and, as the Hearing Officer found, the record supports that the District otherwise crafted an IEP tailored to K.D.'s specific circumstances and needs. *See* AR 464. There is simply no credible interpretation of the record to suggest that the District through its staff, who engaged in detailed, collaborative, and iterative development processes for K.D.'s IEPs, did not otherwise reasonably tailor K.D.'s January 31 IEP appropriately in light of his circumstances.

With respect to Board Certified Behavior Analyst services, Plaintiff argues that because K.D. was in fact receiving Board Certified Behavior Analyst support, his IEP should have explicitly included for the provision of a Board Certified Behavior Analyst, and without that language, he was denied a free appropriate public education. *See* ECF No. 52 at 41–43. To be sure, IEPs must include a statement of services that will be provided to the child. 20 U.S.C. § 1414(d)(1)(A)(i)(IV). And while it is not clear if the assistance of a Board Certified Behavior Analyst in the *development* of a behavior intervention plan would be required to be included in that statement of services, whether a Board Certified Behavior Analyst is necessary to *implement* a behavior intervention plan should be included in such a statement.

The record, however, is mixed on whether a Board Certified Behavior Analyst was necessary to effectively implement K.D.'s behavior intervention plan. Rather, what is clear is that greater support and training were necessary. *See* AR 1218 (Call testifying that clarification was needed on implementing the BIP). For instance, in the year prior to the January 31, 2024 IEP, the

district-wide Jordan Behavioral Assistance Team, or JBAT, often provided that extra support and training to K.D.'s team. While JBAT employed Board Certified Behavior Analysts, the team was not exclusively composed of them. *See* AR 582, 1407.

More importantly, while K.D.'s IEP or behavior intervention plan did not explicitly call for the services of a Board Certified Behavior Analyst, they did explicitly outline training and support for the staff interacting with K.D. and implementing his behavior intervention plan. *See* AR 2118. The court finds that K.D.'s IEP essentially committed to Board Certified Behavior Analyst-like services "using other terms," so there was no necessary service missing in the January 31 IEP. *Elizabeth B. by & through Donald B. v. El Paso Cnty. Sch. Dist. 11*, 841 F. App'x 40, 43 (10th Cir. 2020) (unpublished); *see also* AR 463 (Hearing Officer finding that "[t]here is no evidence in the record to suggest that Student must have [applied behavior analysis] methodology identified in the IEP to receive a [free appropriate public education], nor that the methodology employed by Respondent was inappropriate to meet Student's needs").

In addition, the District's determination that a Registered Behavior Technician was not needed was also reasonable. "[T]he plain language of the IDEA does not require the School District to create any specific intervention plan. Instead, the IDEA only requires the School District to '*consider* the use of positive behavioral interventions and supports.'" *Elizabeth B.*, 841 F. App'x at 42–43 (unpublished) (quoting 20 U.S.C. § 1414(d)(3)(B)(i) (emphasis added)). The record is clear that the District considered the provision of a Registered Behavior Technician but reasonably found it unnecessary. *See* AR 2299. The school's paraprofessionals were highly trained, and with the support and guidance of Board Certified Behavior Analysts and JBAT, the IEP team had the qualifications and experience to tackle K.D.'s IEP and behavior intervention plan. *See* AR 1013 (testimony by Wingert asserting similar); AR 1325 (testimony by Dr. Radley asserting similar).

On this issue, the Hearing Officer weighed BCBA Wingert's testimony above the testimony of others, given her "competencies in both the school and clinical settings as a [Board Certified Behavior Analyst], as well as her regular work with [K.D.]." AR 461. This court similarly finds BCBA Wingert's testimony particularly forceful here, and the court in any case is reticent to second-guess contemporaneous credibility determinations made in the course of regular proceedings.[17] *O'Toole*, 144 F.3d at 698–99 (noting deference is owed to a hearing officer's credibility determinations); *A.H. v. Smith*, 367 F. Supp. 3d 387, 412 (D. Md. 2019) (stating that credibility determinations are owed deference when regularly made).

The court now turns to the last of the issues Plaintiff raises with respect to the January 31 IEP. Plaintiff's claim that K.D.'s parents were not able to meaningfully participate in the IEP drafting process because of the alleged de facto policy similarly fails. Again, the record does not support that there was a de facto policy at work. Even beyond that issue, the record demonstrates that K.D.'s parents were intimately involved in his IEP drafting process and that the District not only seriously considered their input but also often implemented their requests. *See, e.g.*, AR 962, 990–991, 997. As the Hearing Officer noted, "Petitioner remained an active and vocal participant in the development of the IEP and placement decision and any argument to the contrary is simply not supported factually." AR 467–68. *See also Jones v. D.C. Pub. Schs.*, No. 18-CV-17-TNM-ZMF, 2021 WL 3927815, at *5 (D.D.C. Sept. 1, 2021) ("These interactions alone demonstrate

---

[17] The Hearing Officer considered the testimony of others on this topic. For example, the Hearing Officer did not find the testimony of Ms. Clyde, a former teacher of K.D.'s at a previous district, to be helpful because it was too removed and lacking foundation. AR 460. In addition, while the Hearing Officer found the testimony of BCBA Dr. Fischer credible, she did not read his testimony as asserting that only a Registered Behavior Technician supervised by a Board Certified Behavior Analyst could implement K.D.'s behavior intervention plan. AR 461; *see* AR 669, 748–49.

meaningful parental participation as Ms. Jones was repeatedly 'given opportunities to have input' in S.C.'s IEP."); *id.* at *4 (noting that "a parent's right to participate in 'the formulation of their child's IEP does not constitute a veto power over the IEP team's decisions'").

**B.      Implementation of the Prior IEP in the Fall of 2023**

Beyond her claim that the January 31, 2024 IEP was not properly tailored, Plaintiff argues that without the help of a Board Certified Behavior Analyst, the IEP team also failed to implement the April 2023 behavior intervention plan in the Fall of 2023. ECF No. 52 at 39. She asserts that this failure resulted in harm to K.D.'s ability to receive educational benefits and to interact with general education peers, leading to a denial of a free appropriate public education. *Id.* at 41.

This argument also falls short. It is worth reiterating that the factual premise itself of this claim is not consistent with the record. Indeed, four separate Board Certified Behavior Analysts were involved in K.D.'s IEP, in addition to at least one other Board Certified Behavior Analyst on JBAT. Although BCBA Wingert did leave South Hills after K.D.'s seventh-grade year, the Board Certified Behavior Analyst with JBAT engaged with K.D.'s IEP team during the Fall of 2023. AR 439 ¶ 66; AR 1218–19.[18] Ultimately, Board Certified Behavior Analysts were involved directly with K.D.'s IEP team throughout the relevant time period, and the IEP team continuously worked to implement the IEP and behavior intervention plan. *See* AR 1218–19, 1288.

While the record does appear to support that the implementation of the IEP was not always perfect, *see* AR 1819-21, the record does not support that those issues constituted a failure to implement the IEP. "[T]he implementation of the program is an on-going, dynamic activity, which

---

[18] In fact, Plaintiff seeks to bring in additional evidence in support of this point, showing that the JBAT staff met with K.D.'s IEP team twice per month for the *entirety* of the 2023–2024 school year. *See* ECF No. 52 at 27 (citing to Johnson Dep. 27:16–29:2, 29:24–30:20).

obviously must be evaluated as such." *O'Toole*, 144 F.3d at 702. There is no evidence that the District ignored any shortcomings in the IEP to such an extent that they failed to implement the IEP, and in fact the record shows the opposite.

### C.      Placement and Predetermination

Finally, Plaintiff alleges that the District predetermined K.D.'s placement at Kauri Sue, a school that allegedly could not implement his individualized education program. ECF No. 1-1 ¶ 99.

"Placement decisions must be based on the child's IEP, and made by 'a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options.'" *Ellenberg*, 478 F.3d at 1268 (quoting § 300.116(a)(1)); *see Jacobs v. Salt Lake City Sch. Dist.*, 154 F.4th 790, 802 (10th Cir. 2025) ("'Placement decisions must be based on the child's IEP' and must be individualized for each child."). "Although parents are given a right to participate in the placement decision, states retain '[t]he primary responsibility for formulating the education to be accorded a handicapped child,' including the proper educational placement." *Ellenberg*, 478 F.3d at 1278.

The Tenth Circuit has been clear that "[a] school district violates the IDEA if it predetermines placement for a student before the IEP is developed or steers the IEP to the predetermined placement." *Jacobs v. Salt Lake City Sch. Dist.*, 154 F.4th 790, 801 (10th Cir. 2025) (quoting *K.D. ex rel. C.L. v. Dept of Educ.*, 665 F.3d 1110, 1123 (9th Cir. 2011)); *see T.W. v. Unified Sch. Dist. No. 259, Wichita, Kan.*, 136 F. App'x 122, at *11 (10th Cir. 2005) (unpublished) (stating "is improper for an IEP team to predetermine a child's placement, and then develop an IEP to justify that decision"). But it has clarified that "[t]his does not mean, however, that district

28

personnel should arrive at the IEP meeting pretending to have no idea whatsoever of what an appropriate placement might be." *T.W.*, 136 F. App'x at *11.

As another district court in this circuit has summarized:

"Predetermination occurs when an educational agency has made a determination prior to the IEP meeting, including when it presents one educational placement option at the meeting and is unwilling to consider other alternatives." *Z.F. v. Ripon Unified Sch. Dist.*, 2013 WL 127662, at *6 (E.D. Cal. Jan. 9, 2013) (citing *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 858 (6th Cir. 2004)). Predetermination violates the IDEA in two ways. First, it contravenes the requirement that "placement be based on the IEP, and not vice versa." *K.D. ex rel. C.L. v. Dep't of Educ., Hawaii*, 665 F.3d 1110, 1123 (9th Cir. 2011) (citing *Spielberg ex rel. Spielberg v. Henrico Cty. Pub. Sch.*, 853 F.2d 256, 259 (4th Cir. 1988)). Second, it denies parents the opportunity to participate meaningfully in the "identification, evaluation, and educational placement of the child." *H.B. ex rel. P.B. v. Las Virgenes Unified Sch. Dist.*, 239 F. App'x 342, 344 (9th Cir. 2007) (unpublished) (quoting 20 U.S.C. § 1415(b)(1)).

*G.W. v. Boulder Valley Sch. Dist.*, No. 16-CV-00374-PAB-SKC, 2019 WL 4464130, at *8 (D. Colo. Sept. 18, 2019).

Plaintiff argues that the Hearing Officer erred in finding that K.D.'s placement to Kauri Sue Hamilton was not predetermined. ECF No. 52 at 43. She argues that the change of placement could not have been based on K.D.'s IEP because the services outlined in his IEP were allegedly not considered in the placement decision. *Id.* at 44. Rather, she asserts that the District first decided to move K.D. to Kauri Sue Hamilton and that figuring out how to implement his IEP at Kauri Sue Hamilton came second. *Id.* at 45.

Plaintiff supports this claim by pointing to testimony from Kristan Thompson, a South Hills case worker and special education teacher, and Kimberly Lloyd, the District Director of Special Education. *See id.* at 43–46.

Plaintiff contends that Thompson's testimony amounted to an inadvertent admission that the District first determined K.D.'s placement and intended to "retrofit a new IEP to match the placement." *Id.* at 44. Thompson testified:

Q. I guess a couple of final things. Do you -- do you know the number of minutes off the top of your head of [K.D.'s] IEP? We can find one if you don't.

THOMPSON: I don't know off the top of my head.

Q. Do you know how -- what the hours of Kauri Sue are?

THOMPSON: I do not.

Q. Do you know that [K.D.'s] academic -- if the service minutes on his IEP can be implemented at Kauri Sue?

THOMPSON: I don't know, but a new IEP could be created for that.

Q. We talked earlier that IEPs drive placement decisions, correct?

THOMPSON: Yes.

Q. So do you know whether [K.D.'s] IEP could even be implemented at Kauri Sue?

THOMPSON: It probably could. I don't -- I don't know for sure because I do not work at Kauri Sue and know their minutes.

Q. And that wasn't something you considered in your placement decision?

THOMPSON: No. It wasn't necessary.

AR 1318–19.

Plaintiff then points to testimony from Lloyd. Plaintiff first highlights that Lloyd stated that Kauri Sue Hamilton's daily school hours were shorter than those of South Hills and that K.D.'s IEP scheduled services for the entirety of the school day at South Hills. AR 1401; *see* ECF No. 52 at 45 (citing AR 1569–92). Then, in response to a line of questioning on whether K.D.'s IEP could

30

be accomplished minute-to-minute at Kauri Sue Hamilton, Lloyd stated that: "[I]f they were doing exactly minutes, that would be a struggle." AR 1402. Finally, on redirect, when asked what her proposal would be for how K.D.'s IEP service minutes could be provided at Kauri Sue Hamilton, Lloyd responded:

> At that point I would propose that the IEP team meet together. If – at Kauri Sue that IEP team . . . determine[s] what the amount of services and minutes would be for [K.D.]. and then if that goes outside of what is normal . . . , that team becomes creative. And . . . multiple teams in that school . . . have been very creative with how they provide services. Sometimes in very – I'm just going to say in very creative ways.

AR 1410–11 (cleaned up). When asked if she thought Kauri Sue Hamilton had the ability to add additional minutes above and beyond what might be typical, Lloyd responded, "I believe there is." AR 1411.

Even considering this testimony, Plaintiff has again failed to meet her burden. Plaintiff's claim is that the District did not make its placement decision based on K.D.'s IEP because his IEP had more service minutes than minutes available at Kauri Sue Hamilton. But Plaintiff reads too much into this fact and not enough into the actual placement decision-making process.[19]

First, there is no question that K.D.'s IEP was not developed after the fact to justify the placement decision. After all, Plaintiff's claim relies on K.D.'s IEP *not* fitting with Kauri Sue Hamilton's hours. Second, the record supports that the District came into the placement discussions

---

[19] Though the court does not base its decision on this observation, it is notable that the 396 daily service minutes is exactly one-fifth of the 1,980 "Bell-to-Bell Weekly Minutes" available at South Hills. AR 1592. It appears to the court that K.D.'s IEP's daily minutes tally was more a product of the time available at South Hills, rather than an affirmative statement of what number of minutes K.D. needed to receive the services that would ensure he has a free appropriate public education. In other words, his IEP team made use of every hour available at the school, as would be expected. Accordingly, shifting that total to accommodate another school's hours would be expected.

31

with an "open mind." *See G.W. v. Boulder Valley Sch. Dist.*, No. 16-CV-00374-PAB-SKC, 2019 WL 4464130, at *9 (D. Colo. Sept. 18, 2019). After the IEP team initially brought up placement, the IEP team heard Plaintiff's concerns and agreed to reevaluate the recommendation based on additional data collected over the following months. AR 452 ¶ 126; AR 2348 (April 29, 2024 meeting notes stating District has not made a determination of placement yet). After that review period, the IEP team continued to believe a change in placement was best, but Plaintiff has not shown by a preponderance of the evidence that the IEP team was willfully incalcitrant. AR 2378 (May 28 meeting notes stating that the IEP team discussed various placement options); AR 2382 (same); *see T.W.*, 136 F. App'x at *11 (unpublished) (holding the same where "[n]otes from the . . . IEP team meetings indicate that contrary to plaintiff's assertions, placement issues were in fact discussed in some detail, with pros and cons of the existing trial placement being hashed out by the participants"). The District's continued belief in a placement change was reasonable because, while K.D. had made some progress in those months, he still faced significant limitations at South Hills. *See* AR 1267 (describing a March 2024 behavioral incident); AR 2316 (March 14 meeting notes discussing an upward trend of aggressive behaviors).

Moreover, the record shows that the placement decision was in fact based upon K.D.'s IEP. However, the IEP team focused on the actual substance of his IEP rather than the number of minutes listed in it. *See* AR 2380 (May 28, 2024 meeting notes stating that the placement change was based on improved transition abilities at Kauri Sue Hamilton, fewer people at Kauri Sue Hamilton, fewer exits at Kauri Sue Hamilton, and peer considerations); AR 2381 (May 28, 2024 meeting notes stating that the IEP team felt the shortened school hours would not be an issue given Kauri Sue Hamilton's enhanced transition abilities); AR 1698 (June 10 Notice of Refusal to Take Action); AR 2267 (January 31, 2024 meeting notes stating that "Team proposed a change of school

[Kauri Sue Hamilton] [sic] because of 80-100% most restricted environment (isolated classroom by bathroom)"); AR 2283 (January 31, 2024 Change of Placement form stating K.D. "requires intensive supports and is not making progress on current goals" and the "[d]egree of curricular instruction and behavior supports needed are not sufficient in the current placement"); *see also* AR 1330–31 (Dr. Radley testifying that he "would not be concerned about the ability . . . of staff . . . at Kauri Sue to implement" K.D.'s IEP).

Considering the record, this is not a case of a District crafting a new IEP post-hoc or ignoring an IEP to brute-force a predetermined placement decision. The record is clear that the District, in consultation with school staff, believed placement at Kauri Sue Hamilton would better serve K.D. and his progress within his IEP. Though they considered Plaintiff's concerns around Kauri Sue Hamilton, they believed that K.D. would better be able to receive support and the services in his IEP at the environment Kauri Sue Hamilton provided. *See G.W.*, No. 16-CV-00374-PAB-SKC, 2019 WL 4464130, at *10. Ultimately, the record supports that there were no procedural or substantive violations of the IDEA in this case.

## CONCLUSION AND ORDER

For the above reasons, the court GRANTS Defendant's motion for judgment on the record. ECF No. 46. The court DISMISSES Plaintiff Kim Deverall's complaint and UPHOLDS the Administrative Hearing Officer's December 31, 2024 decision.

Given the grant of Defendant's motion for judgment on the record, the court DENIES AS MOOT Defendant's motion for entry of a *Honig* injunction. *See* ECF No. 66. The IDEA's automatic "stay put" injunction under 34 C.F.R. § 300.518 is no longer in force. *See Patrick G. by & through Stephanie G. v. Harrison Sch. Dist. No. 2*, 40 F.4th 1186, 1213–14 (10th Cir. 2022) (finding a "stay put" claim moot after dismissal of the underlying substantive claims); *O'Hayre v.*

*Bd. of Educ. for Jefferson Cnty. Sch. Dist. R-1*, 109 F. Supp. 2d 1284, 1293 (D. Colo. 2000) ("Once a final determination is made, the stay-put provision no longer applies.").

Signed July 1, 2026.

BY THE COURT

_____
Jill N. Parrish
United States Chief District Judge